**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, Los Angeles Regional Office, 444 South Flower Street, Suite 900, Los Angeles, CA 90071, <br><br>                              Plaintiff, <br><br> v. <br><br> TOBIN SMITH and <br> NBT GROUP, INC. (FORMERLY CHANGEWAVE, INC. DBA NBT COMMUNICATIONS), <br><br>                              Defendants. | Case No.: |

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("SEC") alleges:

**SUMMARY**

1.      This case involves a fraudulent touting scheme.  In 2012, Defendant Tobin S. Smith, on behalf of his company, Defendant NBT Group, Inc. ("NBT"), entered into two separate agreements to provide "investor awareness" marketing services promoting IceWEB, Inc. ("IWEB"), a penny-stock company.  The Defendants entered into these agreements as part of a scheme involving the now-deceased CEO of IWEB and a broker to inflate the price of IWEB stock.  Under the terms of the agreements, Smith's company, NBT, was to receive a total of $330,000 in cash, as well as IWEB stock, for promoting IWEB.  Although the Defendants did not receive the full amount contemplated by the agreements, they did receive $165,900 and 1,217,105 shares of restricted IWEB stock in exchange for preparing and disseminating emails, online blogs, articles, and other media touting IWEB, with the goal of increasing IWEB's trading volume and share price.  The agreements also provided that NBT could earn over $250,000 in

1

additional compensation if the marketing campaigns succeeded in obtaining a sustained increase in share price ("incentive fees"). The Defendants failed to fully and adequately disclose their compensation or the promised incentive fees for promoting IWEB; they also made additional material misrepresentations and omissions regarding IWEB, including unsupported financial projections, and false representations that Smith was immediately purchasing IWEB stock, that IWEB was an acquisition target, and that Facebook was a customer of IWEB.

2. By engaging in this conduct, the Defendants violated the antifraud provisions of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and the antitouting provisions of Section 17(b) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(b).

3. The SEC seeks a permanent injunction prohibiting future violations, penny stock bars, and disgorgement of ill-gotten gains together with prejudgment interest against both Defendants, and a civil penalty against Defendant Smith.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a). Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

5. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), because the

Defendants transact business in this district and certain of the transactions, practices, and courses of business constituting violations of the federal securities laws occurred within this district.

## THE DEFENDANTS

6. **Tobin S. Smith ("Smith")** resides in North Bethesda, Maryland. Smith is the chief executive officer of Defendant NBT Group, Inc. Smith was a Fox News contributor from June 2000 until June 19, 2013, including on the "Bulls and Bears" television show on Fox News Channel. At all times relevant to this action, Smith described himself on the NBT website as a "contributor and market analyst for Fox News and more recently Fox Business Network." Fox News terminated its contract with Smith in 2013 on the grounds that Smith violated network policy when he received compensation to promote the stock of a different company.

7. **NBT Group Inc. (formerly ChangeWave, Inc., dba NBT Communications) ("NBT")** is a Maryland corporation with its principal place of business in Rockville, Maryland. NBT is "in the business of [publishing] sponsored investment research" on behalf of public companies and producing "direct marketing" material that "mak[es] the investment case" for the companies. Typically, the issuer itself retains NBT to write the research reports. NBT is controlled and managed by Defendant Smith, its founder, chief executive officer, chief investment officer and chief research officer. The only other officer and/or employee of the company during the relevant period was Smith's wife.

## THE ISSUER

8. **IceWEB, Inc. ("IWEB")** is a Delaware corporation. It manufactures and markets data storage products, custom built appliances and cloud based software and services. IWEB's common stock is registered with the SEC pursuant to Section 12(g) of the Exchange Act, 15 U.S.C. § 78*l*(g), and trades on the OTC Bulletin Board. During the relevant period,

IWEB's principle place of business was Sterling, Virginia.  On January 5, 2015, IWEB changed its name to UnifiedOnline, Inc.; it is presently headquartered in Fairfax, Virginia.

9. During the relevant period, IWEB's stock price ranged from approximately five to seventeen cents per share, rendering it a "penny stock" within the meaning of Section 3(a)(51)(A) of the Exchange Act, 15 U.S.C. § 78c(a)(51)(A), and Rule 3a51-1 thereunder, 17 C.F.R. § 240.3a51-1.

## THE BROKER

10. **George Johnson ("Johnson")** was a registered representative (stock broker) at a brokerage firm registered with the Financial Industry Regulatory Authority ("FINRA").  FINRA is a self-regulatory organization registered with the SEC pursuant to the Exchange Act as a registered securities association.

11. On April 8, 2015, FINRA's Department of Enforcement charged Johnson in a FINRA Disciplinary Proceeding with violations of the antifraud provisions of Section 10(b) of the Exchange Act and Rule 10b-5, as well as various FINRA rules, for manipulating the volume and price of IWEB stock during the period of May 15, 2012 through May 24, 2012.  *Department of Enforcement v. George Johnson*, Disciplinary Proceeding No. 2013035533701.  On February 18, 2016, FINRA issued an Order Accepting Offer of Settlement pursuant to which Johnson, without admitting or denying FINRA's allegations, was barred from associating with any FINRA member in any and all capacities.

## THE DEFENDANTS' FRAUDULENT TOUTING OF ICEWEB STOCK

A. The May 2012 Promotional Campaign

12. On or about May 9, 2012, Johnson, who personally owned approximately 1,520,000 shares of IWEB, and whose customers owned an additional 9,377,681 shares of

4

IWEB, emailed Smith and suggested that Smith get together with IWEB's then CEO.

13. Smith understood from his initial communications with Johnson that Johnson owned "a ton" of IWEB stock. Additionally, from a subsequent May 10, 2012 email from Johnson stating "I was just a little early," Smith understood that Johnson's investors were under water, that the stock was not trading, and that the stock price was below what Johnson's clients paid for it.

14. On or about May 15 or 16, 2012, Smith visited IWEB's offices and interviewed its then-CEO, as Johnson had suggested.

15. On or about May 22, 2012, the Defendants entered into a Professional Services Agreement with a consulting group retained by IWEB. The agreement reflected the terms negotiated by Smith with IWEB's CEO, and obligated the Defendants to provide services promoting IWEB. .

16. Specifically, pursuant to the agreement, NBT was to perform promotional services for IWEB, including: (1) an NBT Equities Research initial report and updates; (2) advertisements sent to email subscriber lists; and (3) social media blogging.

17. In exchange:

    a. the consulting group was to pay NBT $50,000 for the production and distribution of the IWEB dedicated email advertorial campaign for the period from May 22 through May 25, 2012; and

    b. the consulting group or IWEB was to pay NBT incentive fees of:

        i. 10% of the expected PIPE transaction proceeds for IWEB stock following the May 22-25 investor marketing campaign; and

        ii. 10% of the expected $0.17 or higher warrant conversion proceeds

into IWEB common shares following the May 22-25 investor marketing campaign.

18.     In fact, any fees paid by the consulting group were first going to be paid by IWEB to the consulting group, which meant that IWEB was paying the fees.

19.     In none of the promotional materials that the Defendants created and issued regarding IWEB from May 21 to May 25, 2012, did the Defendants disclose that IWEB had agreed NBT would be paid incentive fees if the price of IWEB stock increased to a certain level following the May 21-25 marketing campaign.

20.     Smith understood that IWEB contracted with him through the consulting group because IWEB wanted to increase its number of shareholders, to increase its trading volume, and to "uplist" from trading on the over-the-counter (OTC) market to the NASDAQ.  Smith also understood that IWEB had $2 million in outstanding $0.17 warrants that could be converted by the warrant holders to IWEB stock once the stock price increased sufficiently (to about $0.20 per share).  Exercise of the warrants would result in IWEB receiving the $2 million from warrant holders purchasing IWEB stock.

21.     Smith knowingly participated in a fraudulent scheme with IWEB's then CEO and Johnson whereby he touted IWEB to cause its price to increase sufficiently for warrant holders to exercise their warrants, providing increased cash to IWEB and commissions to Johnson.  In furtherance of the fraudulent scheme, from May 16-18, 2012, Smith engaged in the following email exchange with Johnson:

Smith:     ". . . What is the day you need it to peak to convert the warrants at .17?. . . Thursday [May 24] is best for you to convert warrants. . . $2 million right?"

> Johnson:       "Yep. . . . let's go my friend."
>
> Smith:         "Thursday it is. . ."
>
> Johnson (on May 18):  "Are you confident on this one my friend?"
>
> Smith:         "110% confident. . . we added a $100 million trading group to the mix. . . you WILL be where u want to be."

22. On May 18, 2012, the Defendants received two payments totaling $44,500. These payments constituted partial payment for the anticipated email campaign to be conducted on behalf of IWEB.

23. On May 21, 2012, the Defendants initiated the campaign regarding IWEB by posting on NBT's website a report authored by Smith entitled "By Dumb LUCK I Just Discovered the PERFECT Tech Stock. . . In My Backyard!" [Emphasis original.] Among other representations, the report states that "NBT is initiating coverage" of IWEB, promising that "We will complete an in-depth report on the company. . . but here is the condensed version of our equities research report in progress." The report sets forth an "initial target [price] of $2.25 or 10X projected 2013 sales of $45 million in their low cost/high efficiency unified data storage systems," a "more than 10X upside from the current price per share of .15." An "About the Author" description at the end of the report includes Smith's picture and states that he is a "Contributor and Anchor Fox News Channel and Fox Business Network," in addition to stating his positions at NBT.

24. Smith emailed a virtually identical version of the May 21 report to NBT subscribers on May 22, 2012.

25. Smith made the purported projections regarding IWEB's potential sales based on the assumption that IWEB would be acquired, and based upon the price at which other larger

technology companies with a data storage component were acquired.

26. Based on Smith's discussion with IWEB's CEO earlier in May 2012, Smith knew that there was no evidence that anyone had contacted IWEB about acquiring IWEB. Moreover, although there had been a number of acquisitions of technology companies in the previous twelve months, the acquired companies had far greater revenue than IWEB.

27. Additionally, the other technology companies Smith looked at when making projections regarding IWEB were very large compared to IWEB, and their financials were not comparable to IWEB. Moreover, IWEB's actual 2011 and year-to-date-2012 sales were less than 10% of the $45 million in purported 2013 "projected" sales. Specifically, IWEB's 2011 sales were $2,678,000 and its sales for the first six months of 2012 were $1,892,000. Nor did the Defendants' report disclose or discuss that IWEB's independent auditor had included a "going concern" qualification in each of its annual audit reports for IWEB beginning with IWEB's 2009 fiscal year.

28. Also on May 21, 2012, Smith emailed Johnson regarding the "Final Version" of the IWEB report to be sent to NBT subscribers, saying:

Out to 300k [subscribers] tomorrow…500k Wed…1.5 million Thursday…

We got 3.5 million shares [purchased] today with a water pistol. .

The bazookas come out starting tomorrow…

You close your PIPE [stock offering] deal for them at .17 on Thursday?

Stock will be at .20 or more on Thursday…

Bet you steak at Gibsons…

29. In fact, the volume of IWEB shares traded did increase from 817,800 on Friday, May 18 to 3,419,900 on Monday, May 21, the day Smith posted the initial report regarding

8

IWEB on NBT's website. Despite Defendants' efforts, however, the price of IWEB stock was unchanged during this period.

30. The Defendants did not disclose on NBT's website or in its emails to subscribers the material fact that the purpose of the IWEB touts was to increase the trading volume and price of IWEB stock to a sufficient level ($0.20 per share) to induce warrant holders to convert their outstanding IWEB warrants to IWEB stock.

31. On May 22, 2012, Smith placed a post he authored on NBT's website headlined "IWEB Adds Microsoft Functionality Even the BIG Storage Giants Don't Have." That post concludes: "We LOVE the scrappy underdog's [sic] here at NBT…GREAT buy under 25 cents. I am buying my shares today and will hold them basically until IWEB is bought out by one of the big guys who are TIRED of getting their lunch eaten by scrappy IWEB!" [Emphasis original.] As in the case of the May 21 report, at the end of the post, the "About the Author" description includes a picture of Smith and a statement that he is a "Contributor and Anchor for the Fox News Channel and Fox Business Network."

32. On May 23 and May 24, 2012, Smith caused NBT to send to several hundred thousand subscribers an advertisement for IWEB "From The Desk Of Tobin Smith" which he wrote, headlined "Leading Tech Stock Analyst Tobin Smith Announces 'Strong Buy' Recommendation for this off-the-radar company he is calling the 'Perfect Tech Stock.'"

33. This advertisement contained material misrepresentations and misleading statements concerning IWEB, including that:

- Smith discovered IWEB "by sheer dumb luck," and suggesting that Smith learned about IWEB from "a tech geek golf buddy of mine," when, in fact, Johnson had introduced Smith to IWEB's then-CEO and had suggested that Smith tout IWEB

stock so that Johnson and his clients, and IWEB, could benefit from increases in price and volume of the stock.

- "My Discovery of IceWeb, Inc. Was a Fluke – But I'll TAKE The Profits!" when, in fact, Smith did not own IWEB shares himself.

- Smith found IWEB when he was "searching for a solution to my OWN company's rapidly growing cloud data storage problem." In fact, not only did Smith "find" IWEB as a result of Johnson contacting him, but Smith did not use IWEB for NBT data storage, instead using a provider that had cheaper up-front costs.

- In response to the question: "Who provides the cheapest storage box and more important the lowest cost/highest performance solution to all these public (and private enterprise) data storage centers [Amazon cloud drive, Dropbox, Evernote, iCloud, Microsoft SkyDrive, Google Drive, and SugarSync]? To all the FREE cloud data storage companies? To Facebook?" the advertisement shows a checkbox next to IWEB's name, followed by "BINGO!" In fact, Smith had no knowledge whether any of these entities were IWEB customers when he disseminated the advertisement. Nor did Smith ask IWEB's CEO whether any of these entities were IWEB customers before disseminating the advertisement.

34.   Smith also stated in the advertisement that "I just discovered the perfect tech play I will own forever," representing that he owned IWEB stock, as he had represented in the May 22 post. In fact, Smith did not buy any IWEB shares on May 22 or May 23, and did not later clarify the May 22 post or the May 23 and May 24 advertisement by disclosing that he had not bought IWEB shares.

10

35. The May 23rd and May 24th advertisement also contained highly misleading projections by Smith, who stated that "I can easily make the case for:"

- a "**10X Return -- $200 million valuation** is a cakewalk considering what has been already paid for its competitors with not NEARLY as valuable solution," when in fact Smith had no basis for believing IWEB would be acquired;

- a "**20X Return -- $400 million valuation** is much closer to my end-game take out valuations";

- a "**50X Return -- $Billion valuation** IS a bit out there a bit but I guarantee the tech giant who buys IceWeb will FEEL like they got a $billion company."

[Emphasis original.]

36. Smith followed up these projections with the statement that: "In short: I cannot say it LOUD enough or STRONG ENOUGH: you SHOULD be buying shares of IceWeb (IWEB) NOW Under The .25-.30 per share valuation!" [Emphasis original.]

37. Smith made these projections notwithstanding that he knew of no company that was contemplating purchasing IWEB.

38. Each of the advertisements and posts contained a disclaimer at the end, in most cases printed in very fine print. The disclaimer stated, in part, that IWEB's consultant, "a 3rd party, has paid $50,000 for issuer sponsored research and investor marketing," and that NBT had "not determined if the statements and opinions of the advertiser are accurate, correct or truthful." With regard to the posts purporting to be research reports or reports in progress by NBT's own staff, the disclaimers do not, however, explain which statements in the reports are in fact by the "advertiser." Nor do the disclaimers explain the relationship between IWEB's consultant and its client, IWEB, and that IWEB was ultimately paying for the reports and advertisements. Finally,

11

the disclaimers do not disclose that IWEB, through its consultant, had agreed NBT would be paid incentive fees if the price of IWEB stock increased to a certain level following the May 21-25 marketing campaign.

39. On Friday, May 25, 2012, IWEB's CEO died unexpectedly. The price of IWEB's stock fell from $0.18 per share to $0.12 per share at the close of trading that day. On May 29, 2012, the next trading day, Smith posted on NBT's website a post he wrote entitled: "IceWEB Update: Out of Tragedy Comes Resolve to Finish the Mission."

40. In that post, Smith noted that on the previous Friday IWEB's shares had "plummeted" from $0.17 to $0.12 "in just a few minutes on a huge volume spike," but that this presented "an opportunity to acquire shares here at a superb entry price," and that "I did this morning and strongly recommend you do to[o]." In fact, Smith still had not bought any IWEB shares.

**B.     The July 2012 Through January 2013 Promotional Campaign**

41. On July 16, 2012, when IWEB's stock price had declined to $0.08 per share, Smith drafted and executed on behalf of NBT, a second agreement directly with IWEB entitled "Professional Services Agreement."

42. Under that agreement, NBT agreed to promote IWEB during the period from July 16, 2012 through January 15, 2013 in exchange for maximum payments by IWEB totaling $530,000, consisting of $140,000 in cash, $140,000 in stock and $250,000 from exercise of outstanding warrants. The portion of the fee derived from exercise of outstanding warrants was an incentive fee in that the stock price had to increase sufficiently to induce exercise of the warrants.

43. Also on July 16, 2012, IWEB paid the Defendants the agreed upon $50,000 initial

cash payment by wire transfer to NBT's bank account.

44. As part of the new marketing campaign for IWEB, on July 18, 2012, Smith caused to be posted on NBT's website a blog regarding IWEB. In addition to including a picture and identifying himself at the end of the blog as Founder and Editor-in-Chief for NBTEquitiesResearch.com, Smith identified himself as "Contributor and Anchor for the Fox News Channel and Fox Business Network 2000-2013."

45. As part of the new marketing campaign for IWEB, on July 25, 2012, Smith caused to be posted on NBT's website a post regarding IWEB which made the same misleading projections as to IWEB's likely performance as the May 23rd and May 24th advertisement.

46. On July 30, 2012, IWEB transferred 842,105 IWEB shares to NBT in partial payment for NBT's services.

47. On August 15, 2012, IWEB wired $30,000 to NBT in partial payment for the Defendants' services promoting IWEB.

48. On August 22, 2012, Smith caused to be posted on NBT's website a report entitled "Here is What You Probably WON'T Hear On Today's IWEB Noon EST Shareholder Call." As in the case of the July 18 post, Smith included a picture and identified himself at the end of the post as "Contributor and Anchor for the Fox News Channel and Fox Business Network 2000-2013."

49. As with other posts, Smith included a disclaimer at the end of the July 18, and July 25, and August 22, 2012 posts. Like the disclaimers on the posts in the May campaign, the disclaimer stated that the IWEB consultant, "a 3rd party, has paid $50,000 for issuer sponsored research and investor marketing." In fact, NBT's second agreement was directly with IWEB, and IWEB had agreed to pay significantly more than $50,000, including agreeing to grant Smith

IWEB shares and pay an incentive fee depending on the amount of warrants exercised. The disclaimers were accordingly materially misleading.

50. On August 22, 2012, Smith caused to be posted on NBT's website and circulated to its subscribers a second report regarding IWEB which included a "Rating" of "Strong Buy." The post again included his picture and identified him at the end of the post as "Contributor and Anchor for the Fox News Channel and Fox Business Network 2000-2013."

51. This post included a differently worded disclaimer that represented, among other things, that NBT "or its affiliates have received $80,000 in compensation and 800,000 shares of restricted stock from the company or companies mentioned in this report or agents acting on their behalf." This disclaimer failed to disclose that the $80,000 was received only for the second investor marketing campaign, that NBT had also received $44,500 in payments for the May 2012 campaign it conducted, and that NBT would receive additional cash and stock bringing its total compensation to $280,000 pursuant to its most recent agreement with IWEB, as well as being entitled to up to $250,000 in incentive fees if the stock price increased sufficiently for warrants to be exercised. The Defendants' failure to include these facts rendered the disclaimer materially false and misleading.

52. On August 29, 2012, IWEB wired another $30,000 to NBT in partial payment for the Defendants' services promoting IWEB.

53. On September 12, 2012, NBT received another 375,000 in restricted IWEB shares in partial payment for the services NBT had agreed to provide.

54. On December 18, 2013, and March 11, 2014, a third party which had purchased from IWEB its $60,000 debt to NBT, wire transferred $6,000 and $5,400 respectively, to NBT.

55. The Defendants thus received a total of $165,900 in cash and 1,217,105 restricted

IWEB shares in exchange for their participation in the scheme to manipulate IWEB stock through their false and misleading touts.

## FIRST CLAIM FOR RELIEF
### Fraud In Connection With The Purchase Or Sale Of Securities
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
(Against All Defendants)

56. The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

57. The Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

(a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

58. By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF
### Nondisclosure of Compensation for Touting Stock
**Section 17(b) of the Securities Act**
(Against All Defendants)

59. The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

60. The Defendants, by engaging in the conduct described above, by the use of means

or instruments of transportation or communication in interstate commerce or by the use of the mails, published, gave publicity to, or circulated notices, circulars, advertisements, newspapers, articles, letters, investment services, or communications which, though not purporting to offer a security for sale, described such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

61. By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(b) of the Securities Act, 15 U.S.C. § 77q(b).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the alleged violations.

### II.

Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendants Smith, NBT and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b); and Section 17(b) of the Securities Act, 15 U.S.C. § 77q(b).

### III.

Order Defendants Smith and NBT to disgorge all ill-gotten gains from their illegal

conduct, together with prejudgment interest.

## IV.

Order Defendant Smith to pay a civil penalty under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## V.

Enter an order pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), prohibiting Defendants Smith and NBT from participating in any offering of penny stock.

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:  March 29, 2016            */s/Karen Matteson*
                                  KAREN MATTESON
                                  mattesonk@sec.gov
                                  D. C. Bar No. 362541
                                  Cal. Bar No. 102103
                                  YOLANDA OCHOA
                                  ochoay@sec.gov
                                  Cal. Bar No. 267993
                                  Attorneys for Plaintiff
                                  Securities and Exchange Commission
                                  Los Angeles Regional Office
                                  444 South Flower Street, Suite 900
                                  Los Angeles, CA  90071
                                  (323) 965-3998 (Telephone)
                                  (213) 443-1904 (Facsimile)